## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: August 4, 2014

Docket No. 34,039

CAVU CO., a Nebraska Corporation,

      Respondent-Petitioner,

v.

DOMINGO P. MARTINEZ, Santa Fe
County Assessor,

      Petitioner-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Raymond Z. Ortiz, District Judge**

Sommer, Udall, Sutin, Hardwick & Hyatt, P.A.
Kurt A. Sommer
Santa Fe, NM

Francis P. Matthews
Elkhorn, NE

for Petitioner

Bridget Ann Jacober
Santa Fe, NM

for Respondent

## OPINION

**DANIELS, Justice.**

{1}    In this property tax case, we hold that the appropriate inquiry into the validity of a property's educational exemption from taxation under the exemption provision of Article VIII, Section 3 of the New Mexico Constitution is whether use during the tax year furthers the exempt purpose. Because the taxpayer in this case had only used the property for

1

educational purposes, had declined to use it for noneducational purposes, and was actively negotiating with schools capable of relocating to his campus property during the relevant tax year when the property was temporarily vacant, we reverse the conclusions of the lower courts that the property could not qualify for an educational use exemption and remand the case to the Santa Fe County Valuation Protests Board for further consideration.

## I.  BACKGROUND

**{2}**     The relevant facts are undisputed. Petitioner CAVU Company (Taxpayer), a Nebraska corporation, was the owner of a twenty-six-acre school campus (the Property) in Santa Fe that was developed and improved beginning in 1997 solely for operation as a school. Since opening its doors over fifteen years ago, the Property has been used for educational purposes by several schools and has never been used for any other purpose. The following time line indicates the changes in occupancy of the Property since its development for use as a school.

| | |
|---|---|
| August 1998 to May 2008: | New Mexico Academy for Science and Mathematics |
| June 2008 to January 2010: | (vacant) |
| February 2010 to May 2010: | Clever Canines, L.L.C. (training school for dog owners) |
| June 2010: | (vacant) |
| July 2010 to May 2012: | Santa Fe International Elementary School |
| May 2012 to Present: | Desert Academy |

**{3}**     Taxpayer purchased the Property in 2004, when the New Mexico Academy for Science and Mathematics (NMASM) was experiencing financial difficulties. Taxpayer leased the Property to NMASM for $1.00 per year for several academic years and supported the school with donations in an effort to help NMASM succeed. In August 2007, Taxpayer raised the rent to $10,000 per month, although by November 2007 it was clear that NMASM could not afford that rate. At this point, Taxpayer allowed the school to occupy the building rent free until June 2008, when it closed.

**{4}**     Throughout the remainder of 2008 and all of 2009, Taxpayer actively sought to lease the Property to various other educational tenants, negotiating in particular with Desert Academy. Taxpayer listed the Property for sale on the residential or commercial market but refused to lease the building to anyone other than an educational tenant. According to Taxpayer's affidavit, a film company offered to lease the Property for $15,000 per month in November 2009, but Taxpayer turned down the offer, insisting on "maintain[ing] the property for educational uses only," "continu[ing] in that category" as long as Taxpayer owned it, and "[passing up] any lease, however attractive, other than to an educational facility."

**{5}**     In March 2010, shortly after Taxpayer began temporarily leasing the Property to a training school for dogs and their owners, the Santa Fe County Assessor discovered the Property's sale listing. Although the Assessor was apparently aware that the Property had

been vacant, it was the sale listing that motivated the Assessor to put the Property on the tax rolls and issue Taxpayer a notice of valuation for $6,689,750 for the 2010 tax year. Taxpayer filed an application for an educational use exemption for 2010, which the Assessor denied because "on January 1st of 2009 and 2010" the property "was not used directly and immediately for educational purposes."

**{6}** In July 2010, after protracted negotiations with Desert Academy ended without a deal, Taxpayer successfully entered into a lease with the Santa Fe International Elementary School (SFIES). In his affidavit, Taxpayer states that the lease to SFIES was "for a rental far below market value."

**{7}** Following a March 2011 hearing before the Santa Fe County Valuation Protests Board, the Board reinstated Taxpayer's exemption for 2010. The Board concluded that because Assessor had allowed a similar vacant school—the St. Francis Cathedral School—to remain exempt during the same tax year, Assessor was required to give Taxpayer's property equal treatment under Article VIII, Section 1(A) of the New Mexico Constitution.

**{8}** Addressing the Property's educational use, the Board found that during the Property's vacancy, Taxpayer "was actively seeking a school tenant[,] . . . negotiating with one or more potential tenants[,] . . . commit[ted] to an educational use of the subject property in the form of nominal or significantly reduced rents for such use[, and] . . . not putting the property to any commercially remunerative use—or even any non-educational use at all." Because of the Board's dispositive decision to grant the exemption based on Taxpayer's equal treatment constitutional claim, however, the Board declined to "make a formal decision" on the Property's educational use. Nevertheless, the Board observed that "this case might present one of the rare instances in which temporary nonuse actually constitutes an exempt use of property."

**{9}** On Assessor's appeal, the First Judicial District Court reversed the Board's decision and denied the exemption pursuant to NMSA 1978, Section 7-38-7 (1997) because the Property was not "currently and actively used as an educational facility" *specifically on* January 1, 2010, the Property had been listed for sale to residential or commercial buyers, and no showing of fraud or intentional discrimination entitled the Property to an exemption under Article VIII, Section 1(A). Soon after the district court's ruling, Taxpayer sold the Property to Desert Academy.

**{10}** The Court of Appeals affirmed the district court's denial of the exemption but on different grounds. *See CAVU Co. v. Martinez*, 2013-NMCA-050, ¶¶ 1, 33, 302 P.3d 126, *cert. granted*, 2013-NMCERT-004. The Court held that (1) the district court erred in determining that Section 7-38-7 limited the qualification period for an exemption to January 1 alone because the appropriate qualification period was the previous calendar year and January 1 was simply "the cut-off date," *see id.* ¶¶ 18, 22 & n.2; (2) the Property did not qualify for an exemption because taxes are assessed annually and because the educational use was not "'primary and substantial'" and "'present and actual'" during the previous

3

(2009) calendar year, *see id.* ¶¶ 22 & n.2, 24; and (3) Taxpayer's property was not entitled to an exemption under the constitutional equal treatment provision because the unequal taxation between the two "similarly situated propert[ies]" was not intentional, fraudulent, or discriminatory, *see id.* ¶¶ 25, 32.

**{11}** We granted certiorari to determine whether Taxpayer's active negotiations with potential educational tenants and Taxpayer's rejection of a commercial lease during 2009 qualify as use eligible for exemption. We expressly affirm the other two Court of Appeals holdings as follows. First, the prior calendar year is the appropriate time period upon which to base a property's exemption status, and January 1 is the appropriate "cutoff date" under Article VIII, Section 3 of the New Mexico Constitution; the Property Tax Code, NMSA 1978, Sections 7-35-1 through -38-93 (1973, as amended through 2013); and the Property Taxes chapter of the New Mexico Administrative Code, 3.6 NMAC (03/30/1973, as amended through 04/15/2013). *See CAVU Co.*, 2013-NMCA-050, ¶¶ 15, 17, 33. Second, a taxpayer is not entitled to an exemption under Article VIII, Section 1(A) of the New Mexico Constitution based on evidence that another taxpayer with similarly used property received such an exemption, absent a finding that the unequal taxation was intentional, fraudulent, or discriminatory. *See CAVU Co.*, 2013-NMCA-050, ¶¶ 28, 33. Because the Court of Appeals provided a thorough analysis on these two holdings, we do not add to them. *See State v. Ulibarri*, 2000-NMSC-007, ¶¶ 2-3, 128 N.M. 686, 997 P.2d 818 (writing primarily to emphasize certain points of law and secondarily to affirm the Court of Appeals without "add[ing] anything further to the analysis contained in the opinion of the Court of Appeals").

## II.     DISCUSSION

### A.     Standard of Review

**{12}** This Court reviews an administrative appeal under an administrative standard of review, seeking to determine if the decisions below are fraudulent, arbitrary, capricious, an abuse of discretion, not supported by substantial evidence in the record, or not in accordance with law. *See* NMSA 1978, § 39-3-1.1(D)-(E) (1999); *Rayellen Res., Inc. v. N.M. Cultural Prop. Review Comm.*, 2014-NMSC-006, ¶ 15, 319 P.3d 639; *see also Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶¶ 14 n.7, 15, 133 N.M. 97, 61 P.3d 806 (explaining that authority to review for abuse of discretion is in the appellate court "solely"). In other words, we "conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *Rio Grande Chapter of Sierra Club*, 2003-NMSC-005, ¶ 16. When an administrative decision is based on an issue of law, such as statutory or constitutional interpretation, our review is de novo. *See Rayellen*, 2014-NMSC-006, ¶ 16.

### B.     Determination of Eligibility for Educational Property Exemption

**{13}** We begin our analysis with the recognized and potentially conflicting principles which must provide the boundaries of our decision. The first is that "[p]roperty is presumed

to be subject to taxation." *Georgia O'Keeffe Museum v. Cnty. of Santa Fe*, 2003-NMCA-003, ¶ 32, 133 N.M. 297, 62 P.3d 754; *see also* 3.6.7.16(A) NMAC ("Real property owned by a nongovernmental entity is presumed to be subject to taxation under . . . the Property Tax Code unless an exemption [is] claimed and allowed [under] this section."). The second is the broad and brief constitutional command that "all property used for educational or charitable purposes . . . shall be exempt from taxation." N.M. Const. art. VIII, § 3. Use for educational purposes has been held to mean "the direct, immediate, primary and substantial use of property that embraces systematic instruction in any and all branches of learning from which a substantial public benefit is derived." *NRA Special Contribution Fund v. Bd. of Cnty. Comm'rs*, 1978-NMCA-096, ¶ 35, 92 N.M. 541, 591 P.2d 672 (internal quotation marks omitted). The corresponding *NRA* eligibility test consists of three parts: (1) use that is direct, immediate, primary, and substantial, (2) use that embraces systematic instruction in any and all branches of learning, and (3) use that imparts a substantial public benefit. *See id.* Because this three-pronged eligibility test accommodates a broad range of interpretations, we look next to the history of the exemption and the policy considerations our appellate courts have identified to guide our analysis.

## C.    History and Policy

**{14}**    A 1933 exemption case involving Masonic lodge property surveyed exemption provisions in other jurisdictions and concluded "that few states have constitutional or statutory provisions more favorable to a claim of exemption . . . and that most states have less liberally provided." *Temple Lodge No. 6, A. F. & A. M. v. Tierney*, 1933-NMSC-013, ¶¶ 7, 9-12, 37 N.M. 178, 20 P.2d 280. This Court traced the New Mexico exemption provision back to our 1882 territorial laws, noting that the drafters of the New Mexico Constitution purposely chose to broaden the limited territorial exemption law to include any and all "educational purposes." *See Temple Lodge*, 1933-NMSC-013, ¶¶ 31-32 ("The conclusion is natural, and not readily to be avoided, that a purpose existed to extend the field or liberalize the policy of tax exemption.").

**{15}**    This Court advised applying a common sense construction to the drafters' "deliberate and studious" determination of citizens' rights to an exemption:

> Unlike most constitutional exemptions, [the exemption provision] does not merely define a field of exemption, within which the legislative power may operate from time to time at its discretion. It is affirmative and self-executing. It creates exemptions. It invests citizens with constitutional rights, which administrative officers or Legislature may not impair, and which courts must protect. Generally, such rights are not to be frittered away by a construction so strict as to be unreasonable or harsh. Of course, they are not to be so enlarged as to create rights which the Constitution makers did not contemplate. In short, the canon of strict construction cannot afford a sure formula.

*Id.* ¶¶ 29, 32; *see id.* ¶ 41 (indicating primary or substantial use as the basis of "common sense construction"); *Benevolent & Protective Order of Elks, Lodge No. 461 v. N.M. Prop. Appraisal Dep't*, 1972-NMSC-006, ¶ 6, 83 N.M. 445, 493 P.2d 411 ("The rule in New Mexico is that of reasonable construction [of the constitutional exemption provision], without favor or prejudice to either the taxpayer or the State.") Meanwhile, the exemption provision makes no distinction between private nonprofit and for-profit organizations. *See Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶ 40.

**{16}**    Because there is no mechanical formula for determining eligibility for the constitutional exemption in our constitution, statutes, or administrative code, we have noted that the "broad expression 'used for educational or charitable purposes' necessarily imposes upon the courts a severe task of interpretation" and that "[t]he line of demarcation . . . can take shape only by the gradual process of adjudicat[ion]." *Temple Lodge*, 1933-NMSC-013, ¶ 39; *see also Benevolent & Protective Order of Elks*, 1972-NMSC-006, ¶ 3 ("Except to the extent that the facts as to use [qualifying an exemption claim] are so nearly alike as to logically compel like results, no case can be said to constitute a controlling precedent for another case in this area.").

**{17}**    In the eighty-one years since *Temple Lodge*, our appellate courts' gradual course of adjudication has interpreted the boundaries of the exemption provision through dozens of opinions. In 1978, the Court of Appeals in *NRA* looked to caselaw for New Mexico and other jurisdictions to set out its three-pronged test. *See* 1978-NMCA-096, ¶ 35; *see also id.* ¶¶ 20-45 (surveying and summarizing caselaw). There, the Court allowed a partial exemption for property partly used for education. *Id.* ¶¶ 62-63. The Court stated that an exemption may not be based on "the remote and consequential benefit derived from [the property's] use," *id.* ¶ 25, and that "[w]here the land is idle, unimproved and not in actual use, because of its present unsuitability to the actual activities of the use of the land, it will not qualify for tax exemption in the absence of legislation," *id.* ¶ 61.

**{18}**    While *NRA* is useful for its general guidance, it is by no means inflexible. Over the years the Court of Appeals has seen fit to minimize its importance and depart from its language. Revisiting the *NRA* test in 2003, the Court of Appeals diverged from its interpretation in *NRA* to allow a museum to seek an exemption for educational use that took place off the property in question. *See Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶¶ 2, 55. Although the educational use was arguably remote and consequential—not *present or immediately on* the museum property—our Court of Appeals concluded that "such a unique circumstance requires a slight departure from the full *NRA* standard otherwise applicable, permitting consideration of whatever *intrinsic educational value* a museum has to the museum visitors and of off-site educational programs and activities closely related to and inextricably interconnected with the museum collection." *Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶ 56 (emphasis added). The Court of Appeals remanded the case to the Board with directions to take into consideration the museum's relationship to its offsite educational programs and the extent of any intrinsic educational value the museum provided to the public. *Id.* ¶ 62.

6

**{19}** More recently, in 2013, the Court of Appeals allowed an exemption on "vacant, undeveloped, and unimproved land" held for charitable conservation purposes. *See Pecos River Open Spaces, Inc. v. Cnty. of San Miguel*, 2013-NMCA-029, ¶¶ 1-2, __ P.3d __. Although the Court of Appeals in *NRA* explicitly barred an educational exemption for land that was "idle, unimproved and not in actual use, . . . in the absence of legislation," 1978-NMCA-096, ¶ 61, the Court distinguished the charitable conservation land in *Pecos River* because it provided a substantial public benefit in its idle state. *See* 2013-NMCA-029, ¶¶ 16-18, 22. The Court concluded that "[w]hether the property is in use is completely dependent upon what the proposed use is." *Id.* ¶ 22.

**{20}** We agree with this last statement because we conclude that it reflects the flexibility the drafters granted to our administrative boards and courts for making fact-specific determinations concerning exempt use. Like *Georgia O'Keeffe Museum* and *Pecos River*, this case presents a unique set of circumstances that does not fit neatly within the parameters of the *NRA* test. We see no reason to alter the Court of Appeals holding in *NRA*, *Georgia O'Keeffe Museum*, or *Pecos River*, but we are reluctant to adhere to a mechanical test. *See Temple Lodge*, 1933-NMSC-013, ¶ 39 ("The broad expression 'used for educational or charitable purposes' necessarily imposes upon the courts a severe task of interpretation. . . . The line of demarcation cannot be projected."); *Benevolent & Protective Order of Elks*, 1972-NMSC-006, ¶ 3 ("[N]o case can be said to constitute a controlling precedent for another case in this area.").

**D.     The Appropriate Inquiry Is Whether the Property's Use Furthered the Exempt Purpose**

**{21}** Instead of adding a new fact-specific exception to the rule, we distill the various rules and exceptions governing exemptions to one overarching principle: "[T]he proper focus of any inquiry into the propriety of an exemption is whether the use of the property furthers exempt purposes." *Trinity Episcopal Church v. State Bd. of Tax Comm'rs*, 694 N.E.2d 816, 818 (Ind. Tax Ct. 1998) (representing the source of authority for this proposition on which multiple Indiana cases have since relied); *see also Congregation Machne Chaim, Inc. v. Kwak*, 3 A.D.3d 708, 710, (N.Y. App. Div. 2004) (concluding that the party seeking exemption "submitted the requisite quantum of evidence to establish that its use of the property was in furtherance of its exempt purpose"). This clear and general guidance allows assessors, protests boards, and courts alike to reasonably and flexibly determine how property is actually being used, notwithstanding unique factual circumstances. Such flexibility is particularly important where the exempt use is hindered by some reasonable explanation, whether for expansion of the property; remodeling of a building due to fire, flood, or outdated infrastructure; or any of countless other potential setbacks. *See City & Cnty. of Denver v. Spears Free Clinic & Hosp. for Poor Children*, 350 P.2d 1057, 1058-59, (Colo. 1960) (en banc) (allowing an exemption for a hospital under construction with further work pending due to insufficient funds); *Bd. of Assessors of Sharon v. Knollwood Cemetery*, 246 N.E.2d 660, 664 (Mass. 1969) (allowing an exemption for cemetery land awaiting further burials); *Mount Calvary Baptist Church, Inc. v. Zehnder*, 706 N.E.2d 1008, 1015 (Ill. App. Ct. 1998) (allowing an exemption for church property damaged by fire and caught up in

a dispute over insurance coverage).

**{22}** Rather than supersede the rules found in *NRA*, *Georgia O'Keeffe Museum*, *Pecos River*, and others, our guidance in this case should instead inform any inquiry into the validity of an exemption—particularly where the facts are complex and equity and common sense demand flexibility in the applicable rule. Because the current case presents just such a scenario, we briefly apply the modified *NRA* analysis as a guide, keeping in mind the drafters' "deliberate" intent to "liberalize the policy of tax exemption," *Temple Lodge*, 1933-NMSC-013, ¶ 32, and reserving the final determination for the Board on remand.

**1.     The Use Must Be Direct, Immediate, Primary, and Substantial**

**{23}** "[T]he phrase 'used for educational purposes'... mean[s] 'the direct, immediate, primary and substantial use of property,'" *NRA*, 1978-NMCA-096, ¶ 35, "not the remote and consequential benefit derived from its use," *id.* ¶ 25. *Georgia O'Keeffe Muesum* departed from this rule, but New Mexico appellate courts generally agree that a declared exemption based solely on the unrealized intentions of the owner may be denied. *See Albuquerque Lodge, No. 461, B.P.O.E. v. Tierney*, 1935-NMSC-022, ¶ 29, 39 N.M. 135, 42 P.2d 206 (concluding that "[i]t is the use of property, not the declared objects and purposes of its owner, which determines the right to exemption"); *Grace, Inc. v. Bd. of Cnty. Comm'rs, Cnty. of Bernalillo*,1981-NMCA-136, ¶ 3, 97 N.M. 260, 639 P.2d 69 (holding that property purchased by a church corporation was taxable despite the intent of the church to construct a new church there "sometime in the future").

**{24}** Courts in other jurisdictions have interpreted limits such as these to mean that the use in question must be "more than a mere dream." *See Peoples Faith Chapel, Inc. v. Limbach*, 480 N.E.2d 781, 782 (Ohio 1985) (allowing a church's exemption for adjacent land planned for a school because the project was "one of substance and not a mere dream" (internal quotation marks and citation omitted)); *Trinity Episcopal Church*, 694 N.E.2d at 818-19 (holding that a church was entitled to an exemption for a building being remodeled as a community mental health center because the use "was more than a dream, and that [the taxpayer] did more than merely own the building . . . [by having] taken concrete steps at great expense to prepare the building for use").

**{25}** In the current case, the Court of Appeals refused to recognize Taxpayer's efforts to lease the building to a school as actual use. *See CAVU Co.*, 2013-NMCA-050, ¶ 24 ("We recognize that Taxpayer sought to negotiate with educational tenants during [the relevant] period. Nevertheless, because such negotiations reflect intent for future use of the property rather than 'present and actual' use, we conclude that the property did not qualify for an educational use exemption in 2010.").

**{26}** Because the facts in this case reflect more than intent alone, we disagree. Active negotiations to *continue* the educational use of the building are clearly distinguishable from Taxpayer's "mere dream" or "declared objects and purposes." The evidence demonstrates that

Taxpayer actively sought out and engaged interested educational tenants during all of 2009, negotiating the terms of a lease with at least one—Desert Academy—and turning down a proposed commercial lease from a film company. By working with various potential tenants and negotiating a deal for the educational use of the Property, Taxpayer used the temporarily vacant property in a direct and immediate effort to further its educational use. Taxpayer's rejection of a commercial tenant also advanced the exempt purpose of the Property.

**2.      The Use Must Embrace Systematic Instruction**

**{27}**      The use must "embrace[] systematic instruction in any and all branches of learning." *NRA*, 1978-NMCA-096, ¶ 35. When our appellate courts have focused on what types of instruction qualify as educational, they have concluded that "education is a broad and comprehensive term . . . [that] must be taken in its broad sense." *Id.* ¶ 26 (internal quotation marks and citation omitted); *see also Temple Lodge*, 1933-NMSC-013, ¶ 39 ("In a broad sense, a golf professional, a riding master, or a boxing instructor, is engaged in education."). Even *NRA* declined to define the term too closely, stating that "matters of education are not restricted to academic curricula or to ivy covered halls." *See* 1978-NMCA-096, ¶ 26 (internal quotation marks and citation omitted). In short, "virtually any aspect of the human experience can be considered educational." *Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶ 41.

**{28}**      Our focus here, however, is not on the *type* of educational instruction. Our concern is whether Taxpayer *embraced* educational instruction through use of the Property in 2009, and there is evidence that Taxpayer fulfilled this requirement in both the letter and the spirit of the law. Taxpayer embraced systematic instruction by negotiating to lease the Property to Desert Academy, an established college preparatory school that clearly practices "'systematic instruction in any and all branches of learning.'" *See NRA*, 1978-NMCA-096, ¶ 35. Taxpayer not only pursued a lease with Desert Academy throughout 2009 but refused to lease the Property to a film company in November of that year, furthering the Property's exempt purpose and demonstrating Taxpayer's commitment to that purpose. Taxpayer reinforced these actions by expressly stating as part of its rejection of the film company that "any lease, however attractive, other than to an educational facility will have to be passed up." While Taxpayer's own affidavit is the source of this evidence, other parties were engaged, and the Board remains free to ask Taxpayer to provide more evidence of these matters on remand.

**{29}**      The Board is also in a better position than this Court to weigh any evidence of Taxpayer's pursuit of an educational tenant during 2009 against evidence of Taxpayer's listing of the Property for sale to a commercial or residential tenant. We note that it is not clear from the record whether the Property was ever for sale in 2009, the relevant year in question. We also note that even if Taxpayer had succeeded in leasing or selling the Property to a noneducational tenant, this would not bar exemption if the direct, immediate, primary, and substantial use of the Property still embraced education. *See Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶ 40 ("[T]he phrase 'all property used for educational or charitable purposes' is not limited, as are other phrases, by the words 'not used for commercial purposes' or by the words 'not used or held for private or corporate profit.'"); *Grand Lodge of Ancient & Accepted Masons of N.M. v.*

9

*Taxation & Revenue Dep't*, 1987-NMCA-081, ¶ 17, 106 N.M. 179, 740 P.2d 1163 ("To be exempt from property taxes, property need not be used exclusively for charitable or educational purposes, but those must be the primary or substantial uses."). A question before the Board is whether Taxpayer embraced education through use of the Property that ultimately furthered its educational purpose as a school campus.

### 3.      The Use Must Create a Substantial Public Benefit

**{30}**      A "substantial public benefit" must be "derived" from the use. *NRA*, 1978-NMCA-096, ¶¶ 35-36. Considering the rationale for the exemption provision, courts have emphasized the significance of the implicit quid pro quo between the State and an exempt organization. *See Georgia O'Keeffe Museum*, 2003-NMCA-003, ¶ 46 (describing the purpose of the exemption as "encourag[ing] private citizens to engage in educational pursuits from which the public derives a substantial benefit"); *see also* 71 Am. Jur. 2d *State and Local Taxation* § 269 (2012) ("The fundamental ground upon which the exemption is based is the benefit conferred upon the public by such institutions and the consequent relief, to some extent, of the burden imposed on the State to care for and advance the interest of its citizens."). In other words, "all property should bear its share of the cost of government. Property which is exempt from taxation does not share in the burden. Therefore, in exchange for its exempt status, such property must confer a substitute substantial benefit on the public." *NRA*, 1978-NMCA-096, ¶ 38.

**{31}**      *NRA* defined substantial public benefit to mean "[a] benefit of real worth and importance to an indefinite class of persons who are a part of the public, which benefit comes to these persons from the use of property." *Id.* ¶ 45. Here, we must consider whether Taxpayer's efforts to lease the building to an educational tenant—to the extent of rejecting a commercial tenant—resulted in a substantial public benefit. We conclude that they did. Taxpayer's twenty-six-acre school property is one of a limited number of large campuses in the county built and equipped to accommodate a student body of its size. Even while the Property was temporarily vacant between educational tenants, Taxpayer used it as an educational magnet, drawing potential school tenants into negotiations, all in furtherance of its educational purpose. In light of Taxpayer's efforts, the Property retained the type of "intrinsic educational value" to the community that the Court of Appeals identified in *Georgia O'Keeffe Museum*. *See* 2003-NMCA-003, ¶ 56. This intrinsic educational value was "inextricably interconnected with the" Property even while the classrooms were empty. *See id.* Because of Taxpayer's efforts, one school ultimately leased the Property and another later bought it and still occupies it today. Each year, between SFIES and Desert Academy, hundreds of students have been educated on the Property in part because Taxpayer persisted in seeking out an educational tenant to eventually lease and buy the building. It is for the Board to determine whether Taxpayer's efforts resulted in a substantial public benefit, but it is clear from the evidence that Taxpayer's efforts and use of the Property were applied towards its ultimate educational purpose.

### III.      CONCLUSION

**{32}**      The appropriate inquiry into the validity of a property's exemption from taxation under

the exemption provision of Article VIII, Section 3 of the New Mexico Constitution must include a determination of whether the use furthers the exempt purpose. Because the Board never reached a formal decision regarding the Property's eligibility for exemption, we remand to the Board with directions to determine whether Taxpayer's use of the Property was in furtherance of its exempt purpose.

**{33}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**BARBARA J. VIGIL, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**